UNITED STATES DISTRICT COURT                                JS-6
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES -- GENERAL**

Case No.   **CV 12-10511-JFW (VBKx)**                      Date: October 9, 2013

Title:      Gabrielle Alberici, et al. -v- County of Los Angeles, et al.

**PRESENT:**

**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

**Shannon Reilly**                          **None Present**
**Courtroom Deputy**                         **Court Reporter**

**ATTORNEYS PRESENT FOR PLAINTIFFS:**        **ATTORNEYS PRESENT FOR DEFENDANTS:**
None                                          None

**PROCEEDINGS (IN CHAMBERS):**     **ORDER GRANTING MOTION FOR SUMMARY
                                    JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL
                                    MOTION FOR SUMMARY JUDGMENT BY
                                    DEFENDANTS LAURA MCLUCKEY, VERONICA
                                    ZUNIGA, SANDRA PARRISH-REHOREG, LAURI
                                    LUCHONOK, GALE WESTBROOK, ELVIA VILLA, AND
                                    BRIAN SATTERFIELD  [filed 9/6/13; Docket No. 93]**

On September 6, 2013, Defendants Laura McLuckey, Veronica Zuniga, Sandra Parrish-Rehoreg, Lauri Luchonok, Gale Westbrook, Elvia Villa, and Brian Satterfield (collectively, "Orange County Social Worker Defendants") filed a Motion for Summary Judgment or, in the Alternative, Partial Motion for Summary Judgment ("Motion").  On September 16, 2013, Plaintiffs Gabrielle Alberici, Nicholas Gross, J.A., and G.A. (collectively, "Plaintiffs") filed their Opposition.[1]  On

---

[1]  In addition, on September 16, 2013, Plaintiffs filed a Request for Judicial Notice in Opposition to County of Orange Defendants' Motion for Summary Judgement [Docket No. 127] ("Request for Judicial Notice").  On September 23, 2013, the Orange County Social Worker Defendants filed their Objections to Plaintiffs' Request for Judicial Notice.  Judicial Notice is governed by Federal Rule of Evidence 201, and only applies to judicial notice of adjudicative facts. "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. Rule of Evid.  201.  In other words, "the fact must be one that only an unreasonable person would insist on disputing." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir.1994).  In their Request for Judicial Notice, Plaintiffs request that the Court take judicial notice of two unpublished California Court of Appeal decisions (Exhs. A and B).  However, neither Federal Rule of Appellate Procedure 32.1 nor California Rule of Court 8.1115 permit this Court to consider unpublished California state

September 23, 2013, Defendants filed a Reply.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without oral argument.  The matter was, therefore, removed from the Court's October 7, 2013 hearing calendar and the parties were given advance notice.  After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

## I.       Factual and Procedural Background[2]

### A.       California Juvenile Dependency Proceedings Generally

In California, dependency proceedings in the juvenile court are special proceedings governed by their own set of rules that are set out in the Welfare and Institutions Code ("WIC").  *In re M.C.*, 199 Cal. App. 4th 784, 790 (2011).  Dependency proceedings involve a number of hearings, including an initial detention hearing, jurisdictional and disposition hearings, periodic review hearings, a permanency review hearing, and a hearing to terminate parental rights.  *See* WIC §§ 355, 358, 360, 366, 366.21 - 366.26.

Section 300 of the WIC describes specific situations that will result in bringing a child within

---

court cases.  *See*, Fed. Rule of App. Proc. 32.1 (permitting court to cite to unpublished federal judicial opinions); Cal. Rule of Court 8.1115 (permitting court to consider unpublished California state court opinions only in limited circumstances, such as under the doctrines of law of the case, res judicata, or collateral estoppel).  In addition, Plaintiffs request that the Court take judicial notice of several California statutes (Exhs. C, E, F, G, H, I, J, K, and L) and a Judicial Council of California Criminal Jury Instruction (Exh. D).  However, "there is typically no need to request judicial notice of statutes and regulations pursuant to Federal Rule of Evidence 201," and, instead, the party "should simply include citations to the statutes and regulations within the legal argument portion of their motions."  *U.S. v. Molen*, 2011 WL 1810449, *6 (E.D. Cal. May 9, 2011).  Accordingly, Plaintiffs' Request for Judicial Notice is **DENIED** with respect to Exhs. A through L.  Plaintiffs also request that the Court take judicial notice of several minute orders from the underlying Juvenile Court proceedings (Exhs. M, N, O, P, and Q), and all of the reporter's transcripts from the underlying Juvenile Court proceedings (Item 18).  However, none of these documents were submitted with the Request for Judicial Notice.  Although Plaintiffs attempted to file Exhs. M through Q under seal, Plaintiffs failed to follow Local Rule 79-5.1 and paragraph 9 of the Court's December 17, 2012 Standing Order regarding the sealing of documents, and, thus, those documents were not accepted for filing.  Accordingly, Plaintiffs' Request for Judicial Notice is **DENIED** with respect to Exhs. M through Q and Item 18.  However, to the extent those documents were filed by the Orange County Social Worker Defendants, they have been considered by the Court.

[2]   To the extent any of these facts are disputed, they are not material to the disposition of this Motion.  In addition, to the extent that the Court has relied on evidence to which the parties have objected, the Court has considered and overruled those objections.  As to the remaining objections, the Court finds that it is unnecessary to rule on those objections because the disputed evidence was not relied on by the Court.

Initials of Deputy Clerk _sr_

the jurisdiction of the juvenile court for dependency proceedings.[3]  A dependency proceeding may be initiated when the Department of Child and Family Services ("CFS" or the "Agency") files a WIC §300 Petition.  After the filing of a petition, the juvenile court holds a detention hearing to determine whether the child requires emergency removal from the home.  Shortly thereafter, the juvenile court conducts a jurisdictional hearing to determine whether the allegations alleged in the petition that the child comes within the scope of WIC §300 are true, in which case the child is declared a dependent of the juvenile court.  WIC §§ 315, 334, 356; See *Cynthia D. v. Superior Court*, 5 Cal. 4th 242, 248 (1993).  The burden of proof for the jurisdictional findings is at least a preponderance of the evidence.  *Id.*, at 248.

In the event the Court finds that it has jurisdiction over the child under WIC §300, it will then conduct a disposition hearing to determine whether the child will remain in the home or with the parents under court supervision or whether the child must be removed from the home pursuant to WIC §361(c) requiring family reunification services for twelve months after the child enters foster care.  See WIC §358, 361.5(a)(1)(A), 362.  A child may be removed from a custodial parent if the juvenile court finds clear and convincing evidence that "there is or would be a substantial danger to the physical health, safety, protection or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." WIC §361(c).

"When a child is adjudged a dependent child of the court on the ground that the child is a person described by Section 300, the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child, including medical treatment, subject to further order of the court."  WIC §362(a); See *In re William T.*, 172 Cal. App. 3d 790, 797-798 (1985) (noting that once the juvenile court assumes jurisdiction over a dependent child, it controls "the physical custody, control and the care of" the child).  "The central purpose of the dependency proceeding is to protect the welfare and best interest of the child . . . ."  *Doe v. Mann*, 285 F.Supp.2d 1229, 1237 (N.D. Cal. 2003), *aff'd*, 415 F.3d 1038 (9th Cir. 2005) *cert. denied*, 547 U.S. 1111 (2006).

---

[3]  For example, a child is within the jurisdiction of the juvenile court and may be declared a dependent child of the court if: (a) [t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian.... [;] (b) [t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child ... [;] (c) [t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care.... [;] (d) [t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused, ... by his or her parent or guardian or a member of his or her household, or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse.  WIC § 300.

Initials of Deputy Clerk __sr__

**B.      Dependency Proceedings for John A. and Gregory A.**

This action involves John A. ("John"), who was then 22 months old, and Gregory A. ("Gregory"), who was then a pre-term newborn, who were removed from their parents' custody shortly after the premature birth of Gregory on May 15, 2011 at Hoag Hospital in Newport Beach. Their removal and the events that occurred thereafter have resulted in Plaintiffs - John, Gregory, and their parents, Gabrielle Alberici ("Gabrielle") and Nicholas Gross ("Mr. Gross"), filing this action against more than sixteen defendants, including hospitals, doctors, nurses, and social workers employed by the County of Los Angeles and Orange County for violations of their constitutional rights.[4]

After the birth of Gregory, Gabrielle was released from Hoag Hospital on May 17, 2011. Although Gabrielle was released, Gregory remained in Hoag Hospital's Neonatal Intensive Care Unit ("NICU").  Gabrielle returned to temporarily reside with her mother, Barbara Alberici ("Barbara"), who had cared for her son John while Gabrielle was in Hoag Hospital.  Shortly after being released from Hoag Hospital, Gabrielle began acting irrationally while at Barbara's home, and later at Hoag Hospital on May 20, 2011 when she went to visit Gregory.

As a result of Gabrielle's irrational and bizarre behavior while at the hospital, on May 20, 2011, Gabrielle was placed on a medical hold by Hoag Hospital personnel, who also contacted the Orange County Child Abuse Registry at approximately 9:36 a.m

**C.      Social Worker Elvia Villa's Investigation and Investigative Narrative Report**

The Orange County Child Abuse Registry ("Registry") received an initial report from Hoag Hospital on Friday, May 20, 2011 at approximately 9:36 a.m., about a 49 year old mother of a newborn child who was speaking incoherently, acting irrationally and presented as paranoid.  The report was initially referred to the Orange County Social Services Agency ("OCSSA") as a ten day response, but was elevated to an immediate or emergency response which was assigned to Social Worker Defendant Elvia Villa ("Ms. Villa").

On Saturday, May 21, 2011, Ms. Villa arrived at Hoag Hospital shortly after 1:00 p.m., and conducted an investigation into the report.  Based on the information provided by the Registry and her interviews of hospital personnel, Ms. Villa learned that the mother of the newborn child was Gabrielle, and that the newborn infant was Gregory, who was in the NICU due to his premature birth at 31 weeks gestation at Hoag Hospital on May 15, 2011.  Ms. Villa also learned that after Gabrielle was released from Hoag Hospital on May 17, 2011, she came to the hospital on May 20, 2011 to visit Gregory and she was accompanied by her mother Barbara, who was then 71 years old, and her 22 month old son John, who was born on July 22, 2009.

---

[4]  As a result of rulings by this Court on motions to dismiss and other dismissals filed by Plaintiffs, only the County of Orange and seven individual Orange County Social Worker Defendants remain as defendants in this action.  However, the County of Orange is not a defendant in any of the remaining federal claims.

Initials of Deputy Clerk _sr_

Ms. Villa also learned that Gabrielle lived in Los Angeles and was visiting her mother, Barbara, who lives in Newport Beach, when she prematurely gave birth to Gregory, and that Barbara cared for John while Gabrielle was in the hospital.  Ms. Villa learned that although Gabrielle was released from Hoag Hospital on May 17, 2011, she returned to her mother's condominium, and not to her apartment in Los Angeles, in order to build a breast milk bank for Gregory.  Gabrielle advised Ms. Villa that both John and Gregory were both the result of in vitro fertilization, and that she did not know the biological father of either child.

Based on her interviews of Hoag Hospital personnel, who had personally witnessed Gabrielle's psychotic and paranoid behavior, Ms. Villa learned that while at Hoag Hospital on May 20, 2011, Gabrielle acted violently, aggressively, and irrationally, including removing her clothing and walking around nude, and that she had assaulted five hospital staff members.  Ms. Villa also learned that Gabrielle expressed thoughts of hurting her children to Hoag Hospital personnel and asked Hoag Hospital nurses to put "Gregory back inside her."  In addition, the nurses advised Ms. Villa that Gabrielle attempted to unlock the wheels of Gregory's isolette in the NICU, stating to the nurses that she wanted to take him home.  Gabrielle also told nurses that she wanted her ankles cut for "blood letting" and asked why Gregory would not speak to her, noting that he had talked to her on a prior visit.

Ms. Villa was advised that although Gabrielle had not been psychologically assessed, Hoag Hospital had placed her on a 5150, which Ms. Villa characterized as a "medical hold," which would expire at 8:00 p.m. on Saturday, May 21, 2011, and that Hoag Hospital personnel had released John to Barbara, his grandmother, so she could take him to her home.

Ms. Villa also interviewed Gabrielle, and her mother, Barbara.  Based on those interviews, Ms. Villa learned from Barbara that when Gabrielle returned from the hospital after giving birth to Gregory, she was fine for a few days but then became agitated and aggressive.  Barbara also stated that on May 20, 2011, before leaving for the hospital to visit Gregory, Gabrielle physically assaulted her by hitting her with a broom.  Barbara reported that Gabrielle was very strong and could be violent, and that she would be unable to protect herself or the children from Gabrielle if she returned to Barbara's home.

During her interview with Gabrielle, Ms. Villa reviewed the statements she had received from various Hoag Hospital personnel about Gabrielle's conduct. Gabrielle refused to answer any questions regarding the type of prenatal care she received, and she denied making any statements that she wanted to hurt her children.  However, Gabrielle did not deny the majority of the Hoag Hospital personnel statements describing her conduct, including the allegations that she attempted to remove Gregory from the NICU.  As to that incident, Gabrielle made the bizarre statement  to Ms. Villa that when she went to see Gregory, "he was not in her reach then there was a wrath of energy that my son generated causing him to move towards me."

Gabrielle also advised Ms. Villa that the nurses became upset because she placed her hands over Gregory and created a protective bubble oric shield that would keep him free of all evil and that she was preparing her children for the affair that was going to happen at sunset, which she described as "an ancient ritual where fire has been lit and drums have begun to roll and tonight I will take my children so that I can remove the mask off of Gregory and John so they can see what

Initials of Deputy Clerk  _sr_

is happening in preparation of the sparkling jewel that will be seen and they will go to the jewel and be free."  Investigative Narrative Report (Decl. of Villa, Exh. 1), p. 6.

In Ms. Villa's second interview with Gabrielle later that same day (May 21, 2011), Gabrielle ordered Ms. Villa to sit down, and Gabrielle began speaking irrationally.  When Ms. Villa refused Gabrielle's request to sit down, she became violent and threatened to stab Ms. Villa in the heart.

Ms. Villa concluded based on the entirety of her investigation that there were exigent circumstances that allowed the children to be placed in protective custody without a warrant, including Gabrielle's mental condition and her reported aggressive behavior and irrational statements, and the fact that Gabrielle's hold was due to expire at 8:00 p.m. and there was insufficient time to obtain a warrant before the expiration of the hold.  Thereafter, Ms. Villa prepared an Application for Petition (Dependent Child) ("Application") for Gregory and John, which included an allegation under WIC § 300(b).  Decl. of Villa, Exh. 2.  In addition, after consulting with her supervisor, Jennifer Palmquist, Ms. Villa physically removed John, who had returned to Barbara's home earlier that day, from Barbara's home, and he was taken to Orangewood Children's Home ("Orangewood").  Ms. Villa placed Gregory on a hospital hold, which was signed and accepted by Regina Acosta, a registered nurse at Hoag Hospital.

After the children were taken into protective custody on the evening of May 21, 2011, Mr. Gross showed up at Hoag Hospital.  Ms. Villa learned that Mr. Gross had not been at the hospital for Gregory's birth or at any time prior to Gabrielle's discharge from the hospital on May 17, 2011.

Ms. Villa interviewed Mr. Gross, who advised Ms. Villa that he was married to Gabrielle and that they had a "confidential marriage," and that he was against Gabrielle having a second child because of concerns about complications given Gabrielle's advanced maternal age.  Mr. Gross requested that the children be released to him because, although he was not the biological father, he was their next of kin.

After her interview with Mr. Gross, Ms. Villa reviewed the Hoag Hospital records, and discovered that Mr. Gross was not listed on either child's birth certificate and he was not listed as the next of kin on the Hoag Hospital medical records.  During Ms. Villa's earlier interviews with Barbara, there was no discussion about Gabrielle's husband.  Although Ms. Villa discussed releasing the children to Mr. Gross with her supervisor, they decided not to release the children and advised Mr. Gross that he should appear in Court with his marriage certificate and request the Court to release the children to him.

The results of Ms. Villa's extensive investigation were memorialized in an "Investigative Narrative" dated May 21, 2011 that she prepared, and which was approved by her supervisor on May 22, 2011.  Decl. of Villa, Exh. 1.[5]  Ms. Villa had no further involvement in this case after her

---

[5]  Plaintiff's expert, Dr. Samuel Miles ("Dr. Miles"), agrees that Gabrielle was acting irrationally and does not take issue with many of the incidents of bizarre behavior reported by Ms. Villa.  In fact, based on Dr. Miles' review of Gabrielle's medical records, he concludes that she was suffering from an "acute mental disorder," and that "Ms. Alberici [was] gravely disabled."  Dr. Miles also notes that Gabrielle's legs were bloated secondary to her kidneys and that "she asked a

Investigative Narrative was completed and approved by her supervisor on May 22, 2011, and the Application for Petition was prepared.

### D.     Social Worker Laura McLuckey's Interviews and Detention Report

The next step in the Juvenile Court dependency proceedings involved the preparation of the Detention Report by Social Worker Defendant Laura McLuckey ("Ms. McLuckey") filed on May 24, 2011. Decl. of McLuckey, Exh. 3. Prior to preparing the Detention Report, Ms. McLuckey conducted follow-up interviews with Barbara, Gabrielle, Mr. Gross, and various individuals at Hoag Hospital which confirmed in large part Ms. Villa's description of Gabrielle's irrational and paranoid conduct as reported in her Investigative Narrative. In addition, Ms. McLuckey determined from her independent discussions with Hoag Hospital staff that Gabrielle had been diagnosed with post-partum psychosis, and had been transferred to College Hospital in Costa Mesa. Ms. McLuckey was also provided with a copy of the Confidential Marriage Certificate, which confirmed that Gabrielle and Mr. Gross had been married on December 24, 2009.

Ms. McLuckey detailed the results of her investigation in the Detention Report and recommended the continued detention of the children. However, McLuckey also recommended the immediate placement of John with his father, Mr. Gross, and that after Gregory was discharged from the hospital, he should also be released to the care of Mr. Gross.

Ms. McLuckey also prepared a Juvenile Dependency Petition ("Petition") for both children. The Petition was signed by Ms. McLuckey under penalty of perjury, and filed with the Court on May 24, 2011. *Id.*, Exh. 4. The Petition alleged that the children came within the jurisdiction of the Juvenile Court and sought detention under WIC §300(b) (Failure to Protect). The Petition included

---

doctor upstairs to do some bloodletting to relieve the leg bloating." In addition, Dr. Miles notes that Gabrielle was uncooperative during her physical examination and that she did not give adequate responses to the mental status examination. Decl. of Miles, ¶ 31. Based on his review of the records, Dr. Miles opines that the 24 hour hold on May 20, 2011 was reasonable and appropriate. *Id.*, ¶ 29. Dr. Miles opines that "Ms. Alberici suffered from a brief psychotic episode with postpartum onset in May 2011." *Id.*, ¶ 48. Moreover, Dr. Miles acknowledges, that although Dr. Chaffee's discharge diagnosis of bipolar affective disorder was possible, he questions Dr. Chaffee's conclusion because he did not believe she met the full criteria for a manic episode. In addition, it is Dr. Miles' opinion that, "[i]t was reasonable for the PET team from Cottage [sic] Hospital to certify her under Welfare and Institution Code Section 5150 on May 23, 2011 as gravely disabled." *Id.*, ¶ 40. Dr. Miles notes that Gabrielle had multiple telephone calls with Hoag Hospital departments with rambling, nonsensical conversations such as "I want medical records to cancel my order for the dissolution of my son's birth" and calls where she accused Hoag Hospital of improper care of her baby because they did not infuse the baby with fish oil. *Id.*, ¶ 41. Finally, Dr. Miles opines that continued involuntary hospitalization appears to have [been] appropriate at that time and notes Gabrielle remained hospitalized until June 10, 2011 due to her psychotic episode with postpartum onset in May 2011. *Id.*, ¶¶ 44-48. In addition, Plaintiffs' expert, Dr. James Decker ("Dr. Decker") concurs with Dr. Miles and Dr. Decker opines that Gabrielle was not capable of caring for her two sons based on her diagnosis of postpartum depression during her hospitalization at College Hospital. Decl. of Decker, ¶ 57.

Initials of Deputy Clerk _sr_

a brief statement of facts in paragraphs b-1 to b-4 that Ms. McLuckey believed supported the conclusion that the children on whose behalf the Petition was brought were persons within the definition of WIC §300(b).  According to Ms. McLuckey, she believed that although she had recommended that the children be released to Mr. Gross, the Petition was necessary so that a protective order could be obtained to protect the children and to allow the Court to monitor the family.  Ms. McLuckey's involvement in this case ended with the filing of the Petition.

### E.     The May 25 and 27, 2011 Detention Hearings

#### 1.     May 25, 2011 Detention Hearing

On May 25, 2011, Commissioner Jane L. Shade conducted an initial detention hearing on the Petition.  Commissioner Shade appointed counsel Christine Johnson ("Ms. Johnson") to represent Gabrielle, who was not present because she was then hospitalized at College Hospital. Mr. Gross was present, and the Court appointed Stacey Leaton ("Ms. Leaton") to represent him. John and Gregory were not present, and the Court appointed Yana Kennedy ("Ms. Kennedy") to represent them.  The Petitioner was represented by Kevin Dunn ("Mr. Dunn") of the County Counsel's Office.

Commissioner Shade advised Mr. Gross that the Court was required by law to first determine the issue of paternity.  During the hearing, Commissioner Shade was presented with the Confidential Marriage Certificate evidencing Mr. Gross' marriage to Gabrielle on December 24, 2009.  Counsel for Mr. Gross noted that the recommendation of the OCSSA was to release the children to Mr. Gross.  All counsel except the children's counsel supported the OCSSA's recommendation to release the children to Mr. Gross.  Ms. Kennedy, who represented the children, argued extensively against releasing the children to Mr. Gross.  After hearing from counsel for Mr. Gross and Gabrielle, the Court entered temporary orders of detention, and detained both minor children from the care, custody, and control of both parents, placing John at Orangewood. Specifically, the Court found that "it was of immediate and urgent necessity for the protection of the children that they be detained.  The Court finds that there is a substantial risk of detriment to the physical or emotional well-being of the children and there is no reasonable means by which they may be protected without detention."  The Court deferred deciding all other issues, including the release of the children, until the next hearing, which was scheduled for May 27, 2011.  However, the Court did enter a visitation order which allowed Mr. Gross unmonitored daily visitation with John while he was at Orangewood.

#### 2.     May 27, 2011 Detention Hearing

At the May 27, 2011 detention hearing, the Court found that Mr. Gross was the presumed father of John and Gregory, and adopted its prior orders of May 25, 2011 detaining the children because of concern for their safety.  As to visitation, the Court ordered that while children were at Orangewood, the father could visit daily, but after placement of the children, he would only be allowed to visit the children three times per week.  May 27, 2013 Reporter's Transcript, 37:4-9. The Court allowed the mother visitation but it was monitored and limited to three times per week. *Id.*, 37:9-11.  In making its visitation orders, the Court also indicated that Social Services had the authority to liberalize or restrict visitations as to frequency and duration, if necessary, to protect the

children's health or safety.  *Id.*, 37:13-16.  In addition, the Court authorized the release of the children to a suitable adult in the discretion of the Social Services, and set a trial for June 15, 2011. *Id.*, 38:21-24.

**F.     Social Worker Lauri Luchonok's Investigation and the Jurisdiction/Disposition Report**

After Ms. McLuckey's involvement in this case concluded on May 25, 2011, it was assigned to Lauri Luchonok ("Ms. Luchonok") who has worked in the area of social services for 30 years. Ms. Luchonok's primary responsibility involved the preparation of the Jurisdiction/Disposition Report ("JDR"), which was filed with the Court on June 14, 2011, with Addendum No. 1 filed on June 15, 2011, and Addendum No. 2 filed on June 16, 2011.  Decl. of Luchonok., Exhs. 5, 6 and 7. Prior to preparing the JDR, Ms. Luchonok interviewed Gabrielle at College Hospital on several occasions; she also interviewed Mr. Gross and Gabrielle's mother, Barbara, who advised Ms. Luchonok that she had obtained a temporary restraining order against Gabrielle.  Ms. Luchonok interviewed the charge nurse at College Hospital, who advised Ms. Luchonok that Gabrielle had stated that she would kill herself if not released and that Gabrielle wanted to infuse her newborn son with fish oil.  Ms. Luchonok also interviewed other Hoag Hospital staff members and she was able to verify the majority of Gabrielle's bizarre behavior that had been reported and documented in various reports prepared by the other social workers in this case.  Ms. Luchonok also spoke to Gabrielle's sister, Veronica Hebert ("Ms. Hebert"), the children's maternal aunt, about possible placement of the children with her.

Based on Ms. Luchonok's interviews, her review of reports that had been previously prepared in this case, and various hospital and medical records, Ms. Luchonok did not believe the children would be safe in the custody of either parent.  As a result, in the JDR, she recommended that the Court sustain the allegations of the Petition and transfer the case to Los Angeles County for disposition.  Ms. Luchonok also advised the Court in Addendum No. 2 that John would be placed with the maternal grandmother, Barbara, on June 16, 2011, which was same date that Gabrielle and Mr. Gross entered their nolo contendre pleas before Orange County Juvenile Court Referee Barbara Evans.

**G.     June 15 and 16, 2011 Hearings in Juvenile Court**

**1.     June 15, 2011 Hearing**

On June 15, 2011, all parties, including Gabrielle who had been released from College Hospital on June 10, 2011, and their counsel appeared before Referee Evans for trial.  At the onset of the hearing, there was extended discussion about the identity of the biological fathers of the children, and whether appropriate notice had been given to the biological fathers.  After hearing from counsel, the Court made an order authorizing breast feeding with Gabrielle's breast milk, provided that it was tested and it was done with the approval of Gregory's treating physician.

There was also an extended argument regarding placement of the children. Ms. Johnson, counsel for Gabrielle, advised the Court, without stating any reasons, that Gabrielle did not support placement with her mother, Barbara, and that her preference was placement of the children with

Initials of Deputy Clerk __sr__

her sister, Veronica Hebert, who was present in Court. Mr. Gross' counsel argued for immediate release of John to Mr. Gross because he had now been found by the Court to be the presumed father of the children. The Court reiterated its prior order that Social Services could release the child to any suitable adult, which included the grandmother or the aunt. June 15, 2013 Reporter's Transcript, 57:19-26. In addition, Mr. Gross' attorney advised the Court that they were prepared to proceed with trial. However, because notice has not been given to the known biological father of Gregory, the Court continued the trial of the matter until the following day, June 16, 2011.

### 2.   June 16, 2011 Trial

On June 16, 2011, all parties appeared for trial before the Referee Evans. However, instead of proceeding with trial, Gabrielle and Mr. Gross, through their respective counsel, presented the Court with Stipulations Re: Adjudication and two Waiver of Rights - Juvenile Dependency, and advised the Court that they wanted to waive their right to trial and enter pleas of nolo contendre to the Petition filed on May 24, 2011 that had been amended by hand written interlineations, and admit the allegations of the Amended Petition.

Because Mr. Gross initially appeared to be reluctant to enter a plea, the Court advised Mr. Gross that he had a right to be heard and that he was entitled to a hearing or trial on the allegations of the Petition. In addition, Gross was advised that if he entered a plea, the Court would find that the allegations of the Amended Petition were true. Mr. Gross advised the Court that although they agreed to "sign off" on the allegations of the Amended Petition, Mr. Gross was concerned about entering a plea because he believed that the JDR and other reports that the Court would rely on in finding that the allegations of the Petition were true contained a "lot" of false statements.

In response, the Court advised Mr. Gross that he could go to trial and his attorney would have the right to cross-examine the individuals who prepared the reports, he would have the right to call witnesses to prove that the allegations were false, and to personally testify at the trial. After an off the record discussion, counsel advised the Court that they had had the opportunity to speak with their clients, and their clients understood their rights and the consequences of their pleas and were prepared to proceed with the entry of their nolo pleas. The Court then specifically confirmed with both Gabrielle and Mr. Gross that they understood that if they entered a plea of nolo contendre to the allegations (including the allegations that Mr. Gross believed were false) in the Amended Petition, they would not have a hearing, they would be unable to contest those allegations, and the Court would find that the allegations in the Amended Petition were true. In addition, the Court determined that it was their independent, intelligent decision to enter no contest pleas. After conducting an extensive plea colloquy, the Court accepted their nolo contendre pleas, and found that there was a factual basis for their pleas and the allegations of the Amended Petition were true.

After accepting their pleas, the Court ordered the case transferred to Los Angeles, and further stated that all prior orders were to remain in full force and effect until final disposition of the case. The Court adopted the recommendation of Social Services, and the Court ordered the children placed with Barbara. Although counsel for Gabrielle and Mr. Gross objected to placement with Barbara, the Court in effect overruled their objections. June 16, 2011 Reporter's Transcript,

Initials of Deputy Clerk __sr__

77:12-78:8.

### H. The Transfer Order

As a result of the order made by Referee Evans at the hearing on June 16, 2011 transferring the case to Los Angeles, the Senior Social Worker Guadalupe Arteaga, who was acting as Court Officer in the department of the Orange County Superior Court where the hearing took place, prepared a Transfer Order on a pre-printed Judicial Council of California form, which is commonly referred to as a Juvenile Court JV 550 Transfer Order ("JV 550") and which was signed by Referee Evans. However, as set forth in the Declaration of Ms. Arteaga, Ms. Arteaga incorrectly filled out the JV 550 form because she believed that John was still placed at Orangewood, and she had not noticed that the social worker had advised in Addendum No. 2 that John was being placed with the maternal grandmother on June 16, 2011.

In the normal case when a child is transferred to a different county, if the child at the time of transfer is located at an emergency shelter such as Orangewood, the court clerk will check box 4.(f)(2) on the JV-550 form which requires transfer of the child to the receiving county within seven judicial days. Because Ms. Arteaga was not aware that John was placed with his maternal grandmother, she incorrectly checked the box 4.(f)(2) requiring transfer of John within seven days. According to Ms. Arteaga, if she had been aware of John's placement with his grandmother, she would not have checked the box 4.(f)(2). According to Ms. Arteaga, it is always preferable to place the child in a familiar setting, such as with a relative, as opposed to transferring the child, as would have happened in this case, to a foster care facility or group home in Los Angeles.

Ms. Luchonok did not discover that the Transfer Order required the transfer of John within seven days until approximately one week after the June 16, 2011 hearing. When she did discover the error, she immediately contacted Ms. Arteaga and informed her of the error in the Transfer Order. Ms. Luchonok also consulted with the County Counsel, who recommended that John remain with Barbara because it would be detrimental to remove him from a familiar relative and place him in congregate care in Los Angeles.

The Transfer Order was discussed during a final hearing in Orange County Court on June 27, 2011 before Commissioner Jane Shade. The hearing was informally scheduled in order to discuss issues with the prior breast feeding order requiring the testing of Gabrielle's breast milk prior to feeding it to the children. During this hearing, Mr. Dunn raised the issue of a proposed amendment to the Transfer Order. However, when Ms. Leaton, attorney for Mr. Gross advised that her client was not in agreement with any amendment to the Transfer Order, the Court declined to consider any amendment to the Transfer Order stating that she was unwilling to amend order made by Referee Evans, who had acted as a temporary judge pursuant to the agreement of all counsel.

During an extensive discussion among counsel, Ms. Kennedy, attorney for the children, noted how detrimental it would be for the children to be removed from the care of their grandmother, where John had been living without incident, and placed in a foster care facility in Los Angeles. Mr. Dunn joined Ms. Kennedy argument, and shared her concern that it would not be healthy to remove John from the care of his grandmother. Mr. Dunn also concurred with Ms.

Initials of Deputy Clerk  _sr_

Kennedy's observation that it would mean John would have to be transferred to another facility like Orangewood.  When Commissioner Shade declined to consider any amendment to the Transfer Orders, Mr. Dunn advised the Court that he believed the Court Rules provide for the child to be transported within a certain time if ordered by the Court and that "we intend to comply with that."  It appears based on further research and discussions with his supervisor that Mr. Dunn concluded that the child did not have to be physically transferred to Los Angeles.  Mr. Dunn advised Ms. Luchonok of the County Counsel's view as to transfer of the children in an email dated June 27, 2011, which was apparently sent after the Court appearance before Commissioner Shade.

On July 18, 2011, the case was transferred to Los Angeles County.  On September 22, 2011, John and Gregory were removed from Barbara's care and placed with Chris Herbert, the ex-husband of their aunt, Veronica Herbert.  On November 22, 2011, John and Gregory were returned to their parents, Gabrielle and Mr. Gross.

## I.     Procedural History

On March 21, 2012, Plaintiffs filed a Complaint against sixteen defendants in Los Angeles Superior Court.  On July 6, 2012, Plaintiffs filed their First Amended Complaint.  On August 8, 2012, the County of Los Angeles Defendants removed the action to this Court, *Alberici, et al., v. County of Los Angeles, et al.*, Case No. CV 12-6841-JFW (VBKx).

On September 17, 2012, at the hearing on the County of Los Angeles Defendants' motion to dismiss, the Court, with Plaintiffs' counsel's consent, dismissed the following claims alleged in the First Amended Complaint: (1) the 5th Amendment Due Process claim alleged in the first cause of action was dismissed as to all defendants; (2) the 14th Amendment Equal Protection claim alleged in the second cause of action was dismissed as to all defendants; (3) the *Monell* claim alleged in the third cause of action was dismissed as to the County of Orange and the County of Los Angeles; and (4) the 14th Amendment Equal Protection claim based on the alleged right of familial association alleged in the fourth cause of action was dismissed as duplicative of the 14th Amendment Due Process claim alleged in the first cause of action.  In addition, the Court set a deadline of September 21, 2012 for the Plaintiffs to decide if they would dismiss the remaining federal claims alleged in the First Amended Complaint, and, if Plaintiffs chose to pursue those federal claims, Plaintiffs were ordered to file a Second Amended Complaint by September 24, 2012.

Plaintiffs decided to pursue the remaining federal claims, and, on September 24, 2012, Plaintiffs filed a Second Amended Complaint, and attempted to re-plead the federal claims.  However, because Plaintiffs failed to comply with the Court's September 17, 2012 Order, on September 28, 2012, this Court dismissed all of the federal claims alleged in Plaintiffs' Second Amended Complaint, and remanded the action to Los Angeles Superior Court.

In Los Angeles Superior Court, Plaintiffs filed a Third Amended Complaint.  Because the Third Amended Complaint alleged federal claims, the County of Los Angeles Defendants again removed this action to this Court, which was assigned Case No. CV 12-10511-JFW (VBKx).  On January 25, 2013, the Court granted Defendants' motions to dismiss, finding that Plaintiffs' Third Amended Complaint also failed to comply with the Court's September 17, 2012 Order because it

Initials of Deputy Clerk  _sr_

failed to allege specific facts as to each of the Defendants and each of the claims alleged.  The
Court granted leave to amend and ordered Plaintiffs to file a Fourth Amended Complaint that fully
complied with the Court's September 17, 2012 Order in Case No. CV 12-6841-JFW (VBKx) to
allege specific facts as to each of the Defendants that would give rise to liability for each claim
alleged.

On February 15, 2013, Plaintiffs filed a Fourth Amended Complaint.  The Fourth Amended
Complaint is 235 pages long and contains 32 claims.  As stated above, as a result of rulings by this
Court on motions to dismiss claims contained in the Fourth Amended Complaint, and other
dismissals filed by Plaintiffs, only the County of Orange and the seven individual Orange County
Social Worker Defendants remain as defendants in this action, with both state and federal claims
remaining against the seven Orange County Social Worker Defendants and only state law claims
remaining against the County of Orange.  In their Motion, Defendants now seek summary
judgment as to the remaining federal claims against the seven Orange County Social Worker
Defendants.  The remaining federal claims include: (1) the first cause of action for violation of
John's Fourth Amendment rights with respect to his removal and seizure from his parents' custody
against Defendants Ms. Villa, Gale Westbrook ("Ms. Westbrook"), and Ms. McLuckey; (2) the
second cause of action for violation of Gregory's Fourth Amendment rights with respect to his
removal and seizure from his parents' custody against Defendants Ms. Villa, Ms. Westbrook, and
Ms. McLuckey; (3) the third cause of action for violation of Plaintiffs' First Amendment rights to
familial association with respect to John and Gregory's removal and detention against all the
Orange County Social Worker Defendants; (4) the fifth cause of action for violation of the Plaintiffs'
Fourteenth Amendment rights to familial association as to John and Gregory's placement with
Barbara against all the Orange County Social Worker Defendants; (5) the seventh cause of action
for violation of Plaintiffs' Fourteenth Amendment rights with respect to the initial and continued
detention of John and Gregory against all the Orange County Social Worker Defendants; (6) the
tenth cause of action for violation of Plaintiffs' Fourteenth Amendment rights regarding failure to
obey the visitation orders against all the Orange County Social Worker Defendants; (7) the twelfth
cause of action for violation of Plaintiffs' Fourteenth Amendment rights regarding failure to obey the
transfer order against Ms. Luchonok, Sandra Parrish-Rehoreg ("Ms. Parrish-Rehoreg"), and
Veronica Zuniga ("Ms. Zuniga"); and (8) the fourteenth cause of action for violation of Plaintiffs'
Fourteenth Amendment rights regarding failure to obey the breast milk order against Ms. Luchonok
and Ms. Zuniga.

## II.   Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as
to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a).  The moving party has the burden of demonstrating the absence of a genuine issue of fact
for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party
meets its burden, a party opposing a properly made and supported motion for summary judgment
may not rest upon mere denials but must set out specific facts showing a genuine issue for trial.
*Id.* at 250; Fed. R. Civ. P. 56(c), (e); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)
("A summary judgment motion cannot be defeated by relying solely on conclusory allegations
unsupported by factual data.").  In particular, when the non-moving party bears the burden of
proving an element essential to its case, that party must make a showing sufficient to establish a

genuine issue of material fact with respect to the existence of that element or be subject to summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is not enough to defeat summary judgment; there must be a genuine issue of material fact, a dispute capable of affecting the outcome of the case."  *American International Group, Inc. v. American International Bank*, 926 F.2d 829, 833 (9th Cir. 1991) (Kozinski, dissenting).

An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party.  *Anderson*, 477 U.S. at 248.  "This requires evidence, not speculation."  *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1225 (9th Cir. 1999).  The Court must assume the truth of direct evidence set forth by the opposing party.  *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).  However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom.  *See Anderson*, 477 U.S. at 249-50; *TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631-32 (9th Cir. 1987).  Although the party opposing summary judgment is entitled to the benefit of all reasonable inferences, "inferences cannot be drawn from thin air; they must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party."  *American International Group*, 926 F.2d at 836-37.  In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'"  *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).  Therefore, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record has taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 587 (1986).

Finally, although the Court has discretion in the appropriate circumstances to consider materials that are not properly brought to its attention, it is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references.  *See Southern Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

## III.    Discussion

### A.    Plaintiffs' Rule 56(d) Request

In its September 13, 2013 Order, the Court denied as premature Plaintiffs' request to continue the Orange County Social Worker Defendants' Motion pursuant to Rule 56(d), and advised Plaintiffs that a Rule 56(d) request should be included as part of their Opposition. However, because Plaintiffs never refiled their Rule 56(d) request and given the extensive number of filings made by Plaintiffs in opposition to the Orange County Social Worker Defendants' Motion, the Court concludes that Plaintiffs abandoned their Rule 56(d) request.  In addition, to the extent Plaintiffs did not intend to abandon their Rule 56(d) request, the Court finds that Plaintiffs have failed to demonstrate diligence in conducting the additional discovery that was the basis of their Rule 56(d) request.  *See, e.g., Adams v. Allstate Insurance Co.*, 187 F. Supp. 2d 1207, 1213 (C.D. Cal. 2002) (citing *Stitt v. Williams*, 919 F.2d 516, 526 (9th Cir. 1990)) (holding that even when a

Initials of Deputy Clerk __sr__

party has fulfilled the other prerequisites of Rule 56(d), "a court may refuse to continue hearing a summary judgment motion where a party has had the opportunity to conduct discovery in a diligent fashion, but failed to do so").

In addition, it now appears that Plaintiffs' Rule 56(d) request and the Declaration of Danielle K. Little in support of the request were simply not credible in light of the extensive Opposition filed by Plaintiffs, which included the Declarations of Mr. Gross, Ms. Herbert, Gabrielle, three expert declarations (Dr. Miles, Dr. Decker, and Cynthia Epps), and an extensive opposition to the Orange County Social Worker Defendants' Statement of Undisputed Material Facts and Conclusions of Law.  Based on Plaintiffs' Opposition, Plaintiffs did not need to conduct discovery or obtain any additional facts to oppose the Motion, but simply needed additional time to prepare and finalize their Opposition because they mismanaged the time necessary to prepare their Opposition.[6]

## B.    Section 1983 Requirements

"Section 1983 imposes two essential proof requirements upon a claimant: (1) that a person acting under color of state law committed the conduct at issue, and (2) that the conduct deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States."  *Leer v. Murphy*, 844 F.2d 628, 632–633 (9th Cir.1988).

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.' "  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979)).  Section 1983 and other federal civil rights statutes address liability "in favor of persons who are deprived of 'rights, privileges, or immunities secured' to them by the Constitution."  *Carey v. Piphus*, 435 U.S. 247, 253 (1978) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976)).  "The first inquiry in any § 1983 suit, therefore, is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'"  *Baker,* 443 U.S. at 140 (1979).  Stated differently, the first step in a section 1983 claim is to identify the specific constitutional right allegedly infringed.  *Albright*, 510 U.S. at 271.  "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law."  *Baker*, 443 U.S. at 146.

### 1.    Absolute Immunity

The United States Supreme Court has "recognized ... that some officials perform 'special functions' which, because of their similarity to functions that would have been immune when Congress enacted § 1983, deserve absolute protection from damages liability."  *Buckley v. Fitzsimmons*, 509 U.S. 259, 268–69 (1993) (citation omitted).  This immunity extends to individuals performing functions that are "critical to the judicial process itself."  *Miller v. Gammie*, 335 F.3d 889, 896 (9th Cir.2003) (*citing Imbler*, 424 U.S. at 430). For example, prosecutors are absolutely immune in "initiating a prosecution and in presenting the State's case."  *Id.* at 895–96 (*citing Imbler*, 424 U.S. at 431).

---

[6]  Plaintiffs have also made two separate requests to file various documents in opposition to the Motion after the September 16, 2013 filing deadline.  The Court will rule on those requests in a separate minute order.

Initials of Deputy Clerk _sr_

Accordingly, "social workers are entitled to absolute immunity in performing quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings." *Meyers v. Contra Costa Cnty. Dep't of Social Servs.*, 812 F.2d 1154, 1157 (9th Cir.1987); *see also Freemanvibe v. Valley Arts and Science Academy*, 2013 WL 1384992, *4–*5 (E.D. Cal. Apr. 4, 2013).  As such, "all [social worker] actions taken in 'connection with' and 'incident to' ongoing child dependency proceedings [are] entitled to absolute immunity." *Miller*, 335 F.3d at 897.  Thus, actions by a child services worker in exercising independent judgment in determining when to bring custody or dependency proceedings is analogous to the function of a criminal prosecutor.[7] *Covendale v. Dep't of Social and Health Services*, 834 F.2d 758, 763-64 (9th Cir. 1987).

However, to the extent social workers make discretionary decisions and recommendations that are not functionally similar to prosecutorial or judicial decisions, only qualified, not absolute immunity, is available.  *Miller*, 335 F.3d at 898.  "Even actions taken with court approval or under a court's direction are not in and of themselves entitled to quasi-judicial, absolute immunity."  *Id.* at 897.  For example, although prosecutors are absolutely immune for actions taken in their role as advocates, when acting in an investigative capacity, they are only entitled to qualified immunity—a standard that also applies to police officers.  *Buckley*, 509 U.S. at 273–74 and fn. 5.  Thus, "those functions more 'investigative' in nature – searching for 'clues and corroboration' – are more removed from the judicial process and merit only qualified immunity."  *Gregory v. City of Louisville*, 444 F.3d 725, 738 (6th Cir.2006); *see also Paine v. City of Lompoc*, 265 F.3d 975, 982 (9th Cir. 2001) (noting that police officers engaged in investigative conduct are subject to the "immunity standards applicable to those functions, not to those applicable to in-court witnesses, even if the same individual later testifies as a witness").

In *Beltran v. Santa Clara County*, the Ninth Circuit clarified that social workers "are not entitled to absolute immunity for claims that they fabricated evidence during an investigation or made false statements in a dependency petition affidavit that they signed under penalty of perjury." 514 F.3d 906, 908 (9th Cir. 2008) (en banc); *see also Costanich*, 627 F.3d at 1115.  Analogizing the functions performed by social workers to those of prosecutors, the court explained that a "prosecutor doesn't have absolute immunity if he fabricates evidence during a preliminary investigation, before he could properly claim to be acting as an advocate" and, "as prosecutors and others investigating criminal matters have no absolute immunity for their investigatory conduct, a fortiori, social workers conducting investigations have no such immunity."  *Id.* at 908–09.

## 2. Qualified Immunity

"Government officials who perform discretionary functions are entitled to qualified immunity

---

[7]  The Supreme Court has repeatedly emphasized that absolute immunity "is justified and defined by the functions it protects and serves, not by the person to whom it attaches."  *Forrester v. White*, 484 U.S. 219, 227 (1988); *see Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1108 (9th Cir.2010) ("Interpreting the Supreme Court's decision in *Kalina v. Fletcher*, 522 U.S. 118, 127–29, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997), we recently reaffirmed that it is only the specific function performed, and not the role or title of the official, that is the touchstone of absolute immunity") (internal quotation marks omitted).

Initials of Deputy Clerk __sr_

only 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *DiRuzza v. County of Tehama*, 206 F.3d 1304, 1313 (9th Cir. 2000) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "In *Saucier v. Katz,* 533 U.S. 194 (2001), the Supreme Court announced a two-step approach to evaluating qualified immunity claims.  In the first step, [courts] consider whether a constitutional right was violated by the [official's] conduct."  *Graves v. City of Coeur D'Alene*, 339 F.3d 828, 845-46 (9th Cir. 2003) (citations omitted), *abrogated in part by Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County*, 542 U.S. 177 (2004).  If no constitutional right was violated, immunity attaches and the inquiry end.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  In the second step, courts "ask whether the right was clearly established."  *Id.*  "To determine whether a right is clearly established, the reviewing court must consider whether a reasonable officer would recognize that his or her conduct violates that right under the circumstances faced, and in light of the law that existed at that time." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1065 (9th Cir. 2006); *see also Saucier*, 533 U.S. at 202.

In assessing a defense of qualified immunity, deciding whether plaintiff's claimed right was "clearly established" is the central inquiry, for "if the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct."  *Harlow*, 457 U.S. at 818-19.  In order for a right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v Creighton*, 483 U.S. 635 (1987).  "Before being charged with monetary liability, public officials must be given clear notice that their conduct is unlawful."  *Brewster v Board of Educ.*, 149 F.3d 971, 977 (9th Cir. 1998).  In assessing a claim of qualified immunity, therefore, courts should not consider rights in the abstract, but "in a more particularized, and hence more relevant sense."  *Anderson*, 483 U.S. at 640.

The doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law. . . .  [I]f officers of reasonable competence could disagree on th[e] issue [of whether a chosen course of action is lawful], immunity should be recognized."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The plaintiff has the burden of establishing that the constitutional right at issue was "clearly established" at the time of the alleged violation.  *Kennedy*, 439 F.3d at 1065.  The moving defendant bears the burden of proof on the issue of qualified immunity.  *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005)

### C.     The Standard Applied to Plaintiffs' First, Fourth, and Fourteenth Amendment Claims.

In their Fourth Amended Complaint, Plaintiffs allege that Defendants violated their First and Fourteenth Amendment rights to familial association and John and Gregory's Fourth Amendment rights to be free from unreasonable seizure.

### 1.     Fourth Amendment

With respect to John and Gregory's wrongful seizure claims, the Fourth Amendment

provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const., Amend. IV.  "The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of reasonableness upon the exercise of discretion by government officials . . . in order to safeguard the privacy and security of individuals against arbitrary invasions . . .." *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979) (internal quotations omitted).

### 2.    First and Fourteenth Amendment

With respect to Plaintiffs' First and Fourteenth Amendment right to familial association claims, "[i]t is well established that a parent has a fundamental liberty interest in the companionship and society of his or her child and that the state's interference with that liberty interest without due process of law is remediable under 42 U.S.C. § 1983."  *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir.2001) (internal citation omitted), *overruled on other grounds by Galbraith v. City of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).  This constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents.  *Id.*, at 685.  Thus, subsumed in this liberty interest is the right for parents and children to live together without undue governmental interference.  *See Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000).  Furthermore, parents have a constitutionally protected liberty interest in making decisions about the care, custody, and control of their children.  *Miller v. California*, 355 F.3d 1172, 1175 (9th Cir. 2004).  When the state has a legitimate interest in interfering with a parent-child relationship, the state may legitimately interfere so long as it provides "fundamentally fair procedures." *Santosky*, 455 U.S. at 754.

However, the constitutional right is not absolute.  *Mueller v. Auker*, 700 F.3d 1180, 1186 (9th Cir.2012); *Woodrum v. Woodward, etc.*, 866 F.2d 1121, 1125 (9th Cir. 1989).  "Under certain circumstances, these rights must bow to other countervailing interests and rights, such as the basic independent life and liberty rights of the child and of the State acting as parens patriae; and on occasion, this accommodation may occur without a pre-deprivation hearing."  *Mueller*, 700 F.3d at 1186; see also *Woodrum*, 866 F.2d at 1125 ("The interest of the parents must be balanced against the interests of the state and, when conflicting, against the interests of the children").  The Fourteenth Amendment, then, "guarantees that parents will not be separated from their children without due process of law except in emergencies."  *Mabe v. San Bernadino Cnty. Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1107 (9th Cir.2001); *see also Mueller*, 700 F.3d at 1187 ("constitutional rights of parents step aside[ ][i]n an emergency situation when the children are subject to immediate or apparent danger or harm") (internal quotation marks and ellipsis omitted).

### 3.    Standard of Culpability Under the First and Fourteenth Amendment

Initials of Deputy Clerk __sr__

To prevail on Plaintiffs' due process claim premised on the unwarranted interference with familial rights, Plaintiffs' must demonstrate that the government's action at issue was so egregious or ill-conceived that it shocks the conscious.[8]  "[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm."  *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998).  "[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."  *Id.*  To impose liability for violation of an individual due process right, the official's actions must "shock the conscience."  *Id.* at 846; *see also Wilkinson v. Torres*, 610 F.3d 546, 555 (9th Cir. 2010).

In *Porter*, the Ninth Circuit "clarif[ied] the standard of culpability" for due process right to familial association claims in a case brought by the parents of a motorist who was shot and killed by a state highway patrol officer during a suspicious vehicle investigation:

> The parties mistakenly suggest that the choice is between "shocks the conscience" and "deliberate indifference" as the governing standard, when in fact the latter is one subset of the former.  The Supreme Court has made it clear, as the district court correctly recognized, that only official conduct that "shocks the conscience" is cognizable as a due process violation.  *Lewis*, 523 U.S. at 846 (*citing Rochin v. California*, 342 U.S. 165, 172-73 (1952)).  The relevant question on the facts here is whether the shocks the conscience standard is met by showing that Trooper Osborn acted with deliberate indifference or requires a more demanding showing that he acted with a purpose to harm Casey for reasons unrelated to legitimate law enforcement objectives.  *See id.* at 836, 118 S.Ct. 1708.  In our cases following the Supreme Court's enunciation of the shocks the conscience test in *Lewis*, we have distinguished the "purpose to harm" standard from the "deliberate indifference" standard, recognizing that the overarching test under either is whether the officer's conduct "shocks the conscience."  *See, e.g., Moreland*, 159 F.3d at 372.

*Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (finding that the plaintiffs would have to demonstrate that the officer acted with a purpose to harm their son "that was unrelated to legitimate law enforcement objectives" in reversing denial by district court of officer's qualified immunity summary judgment).  This same standard applies to all due process right to familial

---

[8]  It appears that Plaintiffs have alleged two separate First Amendment claims in the third cause of action.  The initial First Amendment claim is identical to their Fourteenth Amendment right to familial association claim, as evidenced by Plaintiffs' allegations relating to "rights to familial association" in the Fourth Amended Complaint, and their citation to *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639-40 (1974), and its pronouncement that "freedom of personal choice in matters . . . family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment."  *See, e.g.,* Fourth Amended Complaint, ¶ 463 and Opposition, 15:9-11.  Plaintiffs' other First Amendment claim relates to their rights to familial integrity and intimate association and is based on the Orange County Social Worker Defendants' alleged refusal to accept the legitimacy of Plaintiffs' family unit.  Because there is no evidence to support this First Amendment claim, the Orange County Social Worker Defendants are entitled to summary judgment on that portion of Plaintiffs' third cause of action.

Initials of Deputy Clerk _sr_

association claims, whether the actions that caused the alleged violation were taken by a law enforcement officer, or a social worker.  *See, e.g., Kulya v. City & County of San Francisco,* 2008 WL 4415116, 2008 U.S. Dist. LEXIS 73952 (N.D. Cal. Sept. 26, 2008) (finding that in order for a social worker's continued detention to violate plaintiff's rights the conduct must be so offensive and intentional as to "shock the conscience").

Although Plaintiffs' First Amendment claims are based on different theories, they each involve official conduct that allegedly interferes with familial relations and, therefore, will be analyzed under the shocks the conscience standard.  *Kinlaw v. Kozaw*, 2010 WL 986925, *6-*7 (N.D. Cal. Mar. 17, 2010) (analyzing the plaintiff's First and Fourteenth rights to familial association claims under the same standard).  In addition, Plaintiffs agree that the shocks the conscience standard is applicable because they have alleged that the Orange County Social Worker Defendants acted with deliberate indifference, which is a subset of the shocks the conscience standard.  *See, e.g,* Fourth Amended Complaint, ¶¶ 454, 460, 465, 481, and 494.

### D.  Ms. Villa Is Entitled to Summary Judgment on the Claims Alleged Against Her.

Plaintiffs challenge Ms. Villa's actions in removing John from his maternal grandmother and placing a hospital hold on Gregory who was in the NICU at Hoag Hospital on the evening of May 21, 2011 without first obtaining a warrant.  As discussed above, a claim by parents regarding the unconstitutional removal of children is properly assessed under the First and Fourteenth Amendment standard for interference with the right to family association while a claim by the child who was seized is assessed under the Fourth Amendment.  *Wallis v. Spencer*, 202 F.3d 1126, 1137 n.8 (9th Cir. 2000).  Because "the same legal standard applies in evaluating First, Fourth, and Fourteenth Amendment claims for removal of children," the claims are analyzed together.  *Id.*

The general standard for both First and Fourteenth Amendment right to familial association claims and Fourth Amendment seizure claims in cases where a child has been removed from the parents' custody is that:

[o]fficials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.

*Wallis*, 202 F.3d at 1138; see also *James v. Rowlands*, 606 F.3d 646, 652 n. 2 (9th Cir. 2010) (holding that seizure of child violates a child's Fourth Amendment rights unless it is authorized by warrant or court order or justified by exigent circumstances).

A government official may intrude on a parent's custody of their children without a warrant if the official has information "at the time of the seizure that establishes" reasonable cause to believe that the child is in imminent danger of serious bodily injury and the scope of the intrusion is reasonably necessary to avert that specific injury."  *Mabe*, 237 F.3d at 1106 *(quoting Wallis*, 202 F.3d at 1138).  The Court uses an objective standard to determine whether information provided an official with reasonable cause to believe exigent circumstances exist.  *See Wallis*, 202 F.3d at

Initials of Deputy Clerk  _sr_

1139 n.9.  No fixed formula determines exigency and Courts consider the totality of the circumstances.  See, *Doe v. Kearny*, 329 F.3d 1286, 1295 (11th Cir. 2003).  Relevant factors that can weigh in favor of exigency include the following: (1) the parents credibility (see *Ram v. Rubin*, 118 F.3d 1306, 1309 (9th Cir. 1997)) and (2) the age of the child (see *Dietz v. Damas*, 932 F.Supp. 431, 447 (E.D. N.Y. 1996) ("babies [are] incapable of testifying")).

        In this case, on Saturday, May 21, 2011, Ms. Villa, determined, based on her extensive interviews with the Hoag Hospital staff, Gabrielle, and Barbara, and her seven years of experience working for OCSSA, and in consultation with her supervisor, Jennifer Palmquist, that there were exigent circumstances that required John and Gregory to be placed in protective custody without a warrant.  Those exigent circumstances included Gabrielle's mental condition, Gabrielle's inability to care for her two sons which has now been confirmed Dr. Miles and Dr. Decker, Gabrielle's reported aggressive behavior and irrational statements, and the fact that Gabrielle's hold was due to expire in a few hours – at 8:00 p.m. that same day – and there was insufficient time to obtain a warrant before the expiration of the hold.  Under these undisputed factual circumstances, the Court finds that there were exigent circumstances giving rise to the need to remove the children without obtaining a protective custody warrant.  In this case, there is no genuine issue of material fact as to existence of reasonable cause to "believe that the [children were] in imminent danger of serious bodily injury and that the scope of the intrusion [was] reasonably necessary to avert that specific injury."  *Mabe*, 237 F.3d at 1106 (*quoting Wallis*, 202 F.3d at 1138); *see also Mincey v. Arizona*, 437 U.S. 385, 393 (1978); *Rogers v. County of San Joaquin*, 487 F.3d 1288, 1294 (2007).

        Furthermore, the analysis does not change once Mr. Gross arrived at Hoag Hospital on the evening of May 21, 2011 after Ms. Villa had already taken John and Gregory into protective custody.  Although Mr. Gross claimed to be the father of the children, he admitted that he was not their biological father, he was not listed as the father on either child's birth certificate, he was not listed as the next of kin in the Hoag Hospital records, he was not present for Gregory's birth, he had not visited either Gabrielle or Gregory in the four days since Gregory's birth, there had been no discussion of "Gabrielle's husband" or Mr. Gross specifically in any of the interviews Ms. Villa had conducted earlier that day, Mr. Gross could not conclusively prove his marriage to Gabrielle, and Ms. Villa was unable to confirm the marriage because of the confidential marriage license.  Therefore, even though Ms. Villa discussed releasing the children to Mr. Gross with her supervisor, they ultimately decided not to release the children to someone who might not be related to the children.  Accordingly, Ms. Villa did not violate Plaintiffs' First and Fourteenth Amendment rights to familial association or John and Gregory's Fourth Amendment rights to be free from unlawful seizure.[9]

_____

        [9]  The Juvenile Court findings are not relevant to whether a sufficient exigency existed at the time of the removal of John and Gregory to justify the warrantless action because such an inquiry must be based on the information that Ms. Villa had on May 21, 2011.  However, the Juvenile Court determination at the hearing on May 25, 2011 to detain the children and place them with OCSSA certainly supports the conclusion that the removal of John and Gregory was justified in light of the facts known to Ms. Villa.  Moreover, even after Mr. Gross presented his confidential marriage license to the Court and was found to be the presumed father, the Court refused to release the children to Mr. Gross, which further supports the reasonableness of Ms. Villa and her supervisor's decision not to release John to Mr. Gross prior to the hearing.

Initials of Deputy Clerk _sr_

Because the Court concludes that there was no constitutional violation caused by the removal of John and Gregory from Gabrielle and Mr. Gross' custody, it need not reach the second step of the *Saucier* analysis.  *See, e.g., Johnson v. County of Los Angeles*, 340 F.3d 787, 793-94 (9th Cir. 2003).  However, even if the Court had concluded that Ms. Villa's conduct constituted a constitutional violation, Plaintiffs have not met their burden of showing that Ms. Villa violated a clearly established constitutional right in the situation presented.  It is beyond dispute that in May 2011 Gabrielle and Mr. Gross had a right not to be separated from their children without due process of law except in circumstances in which a child faces imminent danger of injury.  *Mabe*, 237 F.3d at 1107 (*citing Santosky*, 455 U.S. at 753).  However, the case law at that time would not have made it apparent to a reasonable social worker that John and Gregory's temporary removal from their parents' custody or Ms. Villa's decision not to release John to Mr. Gross when Mr. Gross arrived at Hoag Hospital would have been clearly unlawful under the circumstances Ms. Villa confronted at the time.  It is exactly these kind of decisions made under difficult conditions and uncertain law that qualified immunity is designed to protect.  "One of the cardinal purposes of immunity is to offer the police ' a fairly wide zone of protection in close cases.'" *Veilleux v. Perschau*, 101 F.3d 1, 3 (1st Cir. 1996) (*quoting Roy v. Inhabitants of the City of Lewston*, 42 F.3d 691, 695 (1st Cir. 1994)).  Officers faced with such decisions must be allowed a broad margin of error.  *Anderson*, 483 U.S. at 638.  Stated differently, the Court finds that a reasonable social worker could have believed that exigent circumstances existed sufficient to override the warrant requirement.  Accordingly, Plaintiffs have failed to demonstrate either that Plaintiffs' constitutional rights to familial association or to be free of unlawful seizure were violated or that the rights claimed were clearly established.  Therefore, Ms. Villa is entitled to qualified immunity.

Accordingly, Ms. Villa is entitled to summary judgment on the first cause of action for violation of John's Fourth Amendment rights to be free of unlawful seizure, the second cause of action for violation of Gregory's Fourth Amendment rights to be free of unlawful seizure, the third cause of action for violation of Plaintiffs' First Amendment rights to familial association with respect to John and Gregory's removal and detention, and the seventh cause of action for violation of Plaintiffs' Fourteenth Amendment rights to familial association with respect to John and Gregory's detention.  In addition, because "[l]iability under Section 1983 arises only upon a showing of personal participation by the defendant," and it is undisputed that Ms. Villa did not have any involvement with this case after May 22, 2011, she is also entitled to summary judgment on the fifth cause of action for violation of Plaintiffs' Fourteenth Amendment rights to familial association with respect to John and Gregory's placement with Barbara and the tenth cause of action for violation of Plaintiffs' Fourteenth Amendment rights for violation of the visitation order.  *Taylor*, 880 F.2d at 1045; *see, e.g., Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004) ("Integral participation [is required] by each officer as a predicate to liability, but 'integral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation").  Officers are not integral participants simply by virtue of being present at the scene of an alleged unlawful act.  *Jones v. Williams*, 297 F.3d 930, 935 (9th Cir. 2002).  Instead, integral participation requires some fundamental involvement in the conduct that allegedly caused the violation.  *See Id.*  Similarly, because none of the other Orange County Social Worker Defendants had any involvement with the decision to place John and Gregory in protective custody, they are entitled to

summary judgment on all of Plaintiffs' claims alleged against them to the extent those claims are based on the removal of John and Gregory from their parents' custody.

### E.     Ms. McLuckey Is Entitled to Summary Judgment on the Remaining Claims Alleged Against Her.

Plaintiffs challenge Ms. McLuckey and the other Orange County Social Worker Defendants' actions in continuing to detain John and Gregory.  Specifically, Plaintiffs allege that John and Gregory's continued detention violated their First and Fourteenth Amendment rights to familial association.[10]

In this case, Ms. McLuckey conducted a thorough investigation, including follow-up interviews with Gabrielle, Mr. Gross, Barbara, and various individuals at Hoag Hospital, and based on her investigation, prepared a Detention Report and Petition as to both children that alleged they came within the jurisdiction of the Juvenile Court and sought the detention of the children under WIC § 300(b) (Failure to Protect).  In her Detention Report, Ms. McLuckey recommended the placement of the children with their father, Mr. Gross, but that the Petition was necessary so that a protective order could be obtained that would allow the Court to monitor the family.  Therefore, the Court concludes based on the evidence viewed in the light most favorable to Plaintiffs that Plaintiffs have failed to demonstrate conduct on the part of the Orange County Social Worker Defendants that "shocks the conscience" or establishes a claim for deliberate indifference as a matter of law.  Accordingly, Plaintiffs' claims fail because there was no violation of Plaintiffs' First and Fourteenth Amendment rights to familial association in continuing to detain John and Gregory.[11]

The Orange County Social Worker Defendants also argue that they are entitled to absolute immunity.  Plaintiffs acknowledge the absolute immunity doctrine, but argue that Ms. McLuckey is not entitled to absolute immunity because her Detention Report and Petition contain numerous false statements.  The law is clear that although social workers enjoy absolute immunity as described above, "they are not entitled to absolute immunity from claims that they fabricated evidence during an investigation or made false statements in a dependency petition affidavit that they signed under penalty of perjury, because such actions aren't similar to discretionary decisions about whether to prosecute."  *Beltran*, 514 F.3d at 908.

However, the Court agrees with the Orange County Social Worker Defendants and concludes that they are entitled to absolute immunity because Plaintiffs have failed to demonstrate the existence of material false statements.  *Constanich*, 627 F.3d at 1115.  It would have been helpful if the Plaintiffs had cited to the portions of those documents that they contend were false and then provided citations to the evidence in the record that demonstrate falsity and materiality of

---

[10]  The standard for Plaintiffs' First and Fourteenth Amendment rights to familial association claims previously discussed also applies to the claims alleged against Ms. McLuckey.

[11]  It is disingenuous for the Plaintiffs to claim that Ms. McLuckey violated their constitutional rights to familial association when, in fact, she recommended that John and Gregory be reunited with their father, Mr. Gross.  Although the Juvenile Court decided against such a reunification, that decision was out of her control, and certainly not her responsibility.

Initials of Deputy Clerk _sr_

the statements.  Instead, Plaintiffs make general conclusory statements and arguments that the Orange County Social Worker Defendants fabricated evidence.  However, under the circumstances of this case, the Court has carefully reviewed the record and identified those statements Plaintiffs contend are false.  In evaluating Plaintiffs' claim that Ms. McLuckey's Detention Report and Petition contained numerous false statements, the Court reviewed the entire transcript of Ms. McLuckey's deposition taken on August 27, 2013 (Exh. 51) and other evidence submitted by Plaintiffs on this issue.  During her deposition, Plaintiffs' counsel questioned Ms. McLuckey extensively on the alleged false statements in her Detention Report, and in the allegations of the Petition in an effort to demonstrate her statements were false.  For example, Plaintiffs' counsel spent an enormous amount of time examining Ms. McLuckey on her statement that Gabrielle had been placed on a 5150 hold[12] in an unsuccessful attempt to demonstrate that this statement was false.  In addition, Plaintiffs' counsel examined Ms. McLuckey on her alleged false statements that Gabrielle had unresolved mental issues (Depo. of McLuckey, 127:21-23); that the b-4 allegation in the Petition that Gabrielle struck her mother with a broom was false (*Id.*, 129:9-11); that her statement that Mr. Gross minimized or appeased the mother's behavior was false (*Id.*, 136:22-25); and that her statement that Mr. Gross would do whatever Barbara and Gabrielle wanted was false (*Id.*, 137:9-11).  However, Ms. McLuckey fully explained the basis for each of her statements and there was never any admission that the statements were false, or even inaccurate and the other evidence in this case does not demonstrate that these statements were false.

Moreover, in order to succeed on this theory, the Plaintiffs would have to make a substantial showing of deliberate falsehood or reckless disregard for the truth, and establish that but for the dishonesty, the challenged action would not have occurred.  *Bravo v. City of Santa Ana*, 665 F.3d 1076, 1083 (9th Cir. 2011).  Under the second prong, the Court examines whether the challenge documents contained misrepresentations or omissions material to the dependency court's findings in this case.  *Bravo*, 665 F.3d at 1083; *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004) (holding that to succeed on a theory of judicial deception, "a plaintiff must show that the defendant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause" and that "[t]he court determines the materiality of alleged false statements or omissions"); *Liston v. County of Riverside*, 120 F.3d 965, 972 (1997) ("where probable cause is otherwise lacking, an officer who obtains a warrant by recklessly or intentionally including false statements (or omitting material facts) 'cannot be said to have acted in a reasonable manner and the shield of qualified immunity is lost'") (*quoting Branch v. Tunnell*, 937 F.2d 1382, 1387 (9th Cir.1991), *overruled on other grounds by Galbraith*, 307 F.3d at 1125).  In addition, "[t]he omission of facts rises to the level of misrepresentation only if the omitted facts cast doubt on the existence of probable cause."  *Ewing v. City of Stockton*, 588 F.3d 1218, 1226 (9th Cir.2009) (internal quotation marks and citation omitted); *see also United States v. Kiser*, 716 F.2d 1268, 1271 (9th Cir.1983) (holding that a search warrant challenger "must make specific allegations that indicate the portions of the warrant claimed to be false" and that the "challenged statements in the affidavit must be necessary to a finding of probable cause").

---

[12]  In light of the undisputed evidence as to Gabrielle's unstable mental condition, any inaccurate description of the type of hold was irrelevant and certainly was not material to any finding by the Juvenile Court.  This is just one example of how Plaintiffs have attempted to twist at best inaccurate statements into false statements.

Initials of Deputy Clerk _sr_

Even assuming Plaintiffs could meet their burden of demonstrating the existence of deliberate false statements, Plaintiffs have not even attempted to argue, nor could they, that the alleged misstatements were material to the Juvenile Court's determinations in this case.  At the initial detention hearing before Commissioner Shade on May 25, 2011, Mr. Gross, through his counsel, advised the Court that he "understands the very serious nature of this case and how it is very inappropriate at this time for the children to be around their mother until she can stabilize her mental health issues."  May 25, 2011 Reporter's Transcript, 9:16-19.  In addition, after the children's attorney argued against the release of the children, Mr. Gross' attorney further advised the Court:

> I spent quite a bit of time this morning educating him on this process and what he needs to do to create a plan to make sure that his children are safe.  And earlier this morning we formulated the plan that should Mom force herself back to the residence, that he is to immediately call me so that we can work on obtaining a restraining order, that he is to call the police if she is aggressive and showing up at the house, that he is to go home and pack up her belongings and arrange for either the grandmother or one of the maternal aunts to come by and pick up her belongings.

> But Mr. Gross made it very clear to me today that he was not welcoming their mother back into the home, understanding that his children would be at risk if she were permitted to do that.  So that's the plan that he has in place.  So far I think its very appropriate.

Thereafter, the Court entered the following temporary order:

> After hearing counsels' arguments and carefully reading the detention hearing report, the Court finds and orders as follows: It is of immediate and urgent necessity for the protection of the children that they be detained.  The Court finds there is a substantial risk of detriment to the physical or emotional well-being of the children, and there is no reasonable means by which they may be protected without detention.

Moreover, the challenged statements contained in the various reports submitted to the Juvenile Court were totally irrelevant to the Court's final detention order issued on June 16, 2011 in light of Plaintiffs' nolo contendere pleas and the extensive colloquy that occurred between the Court and Plaintiffs prior to the Court accepting those nolo contendere pleas.  Specifically, Plaintiffs were advised that the Court would rely on the various reports in making its final detention orders at the June 16, 2011 hearing, and Plaintiffs were reluctant to proceed because Mr. Gross advised the Court that the reports were based on a lot of false statements.  However, instead of proceeding to trial, at which he would have been able to offer evidence that those statements were false, Plaintiffs agreed to enter a plea of nolo contendere, which under California law is the equivalent to a guilty plea.  *See, e.g., Troy Z. v. San Diego County Department of Social Services*, 3 Cal. 4th 1170, 1181 (1992) (holding that a plea of no contest under the California Welfare and Institutions Code is equivalent to a defendant's plea of guilty or nolo contendre in a criminal proceeding)*; see also Ove v. Gwinn*, 264 F.3d 817, 823 n. 4 (9th Cir. 2001) (Ninth Circuit assumed that a nolo contendere plea was the equivalent of a guilty plea for *Heck* analysis under California law); *Nuno v. County of San Bernardino*, 58 F.Supp. 2d 1127 (C.D. Cal. 1999) (holding that fact that convictions

Initials of Deputy Clerk  _sr_

were by plea of nolo contendre, and not a plea of "guilty," did not affect application of rule of preclusion).  As a result, the Court had sufficient independent basis to enter the detention orders based solely on Plaintiffs' nolo contendre pleas, and it was unnecessary for the Court to rely on the information in the reports, and, thus, any false statements that may have been included in the reports would have been totally irrelevant to the Court's decision to detain John and Gregory.

Given the undisputed facts, no reasonable juror could conclude that the challenged statements were intentionally false when Ms. McLuckey made them or that they were material to the Juvenile Court proceedings in light of Gabrielle and Mr. Gross' nolo contendre pleas. Accordingly, Plaintiffs' claims fail because there was no constitutional violation.

Because the Court concludes that there was no constitutional violation caused by the continued detention of John and Gregory, it need not reach the second step of the *Saucier* analysis.  *See, e.g., Johnson*, 340 F.3d at 793-94.  However, even if the Court had concluded that Ms. McLuckey and the other Orange County Social Worker Defendants' conduct constituted a constitutional violation, Plaintiffs have not met their burden of showing that Ms. McLuckey and the other Orange County Social Worker Defendants violated a clearly established constitutional right in the situation presented.  The Court concludes that, because the lawfulness of the children's continued detention tracks that of their initial removal, the case law would not have placed a reasonable social worker on notice that the detention of the children from their removal until the initial detention hearing on May 25, 2011 when Commissioner Shade ordered the children detained was illegal.

In addition, the Court concludes that Gabrielle and Mr. Gross' First and Fourteenth Amendment claims with respect to John and Gregory's removal and detention are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).  In *Heck*, the Supreme Court held that where a complaint for damages under § 1983 implicates the validity of a conviction, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction has already been invalidated.  *Id.* at 486-87.  In this case, Gabrielle and Mr. Gross pled no contest to violating California Welfare and Institutions Code § 300(b).  The California Supreme Court has held that a plea of no contest under the California Welfare and Institutions Code is equivalent to a defendant's plea of guilty or nolo contendere in a criminal proceeding.  *Troy Z.*, 3 Cal.4th at 1181; *see also Nuno*, 58 F.Supp.2d at 1127 (holding that fact that convictions were by plea of nolo contendere did not affect application of rule of preclusion).  The Court concludes that the issue of whether John and Gregory were rightfully removed and detained implicates the validity of Gabrielle and Mr. Gross' no contest pleas. Therefore, these claims are barred by *Heck.  See, e.g., McConnell v. Lassen County, California*, 2007 WL 1931603 (E.D. Cal. June 29, 2007) (holding that plaintiffs could not maintain ineffective assistance of counsel and coercion claims where they had pled no contest to a violation of California Welfare and Institutions Code § 300(b)).

Moreover, to the extent *the Heck* doctrine does not apply to all of the claims asserted by Plaintiffs, the Court concludes that the Juvenile Court's orders detaining the children and placing them in the care of their grandmother are preclusive barring Plaintiffs from pursuing those claims in this action.  Because the issues that Plaintiffs seek to litigate in federal court are identical to those decided during the detention hearings, Plaintiffs are barred from relitigating those issues.  *Migra v. Warren City School Board of Education*, 465 U.S. 75, 81 (1984) ("[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of

Initials of Deputy Clerk _sr_

the State in which judgment was rendered").  Although Plaintiffs might have been able to avoid the *Heck* bar and issue preclusion result if they had moved under WIC § 388(a)(1) to vacate or set aside the orders of the Juvenile Court, they apparently decided not to do so.

Accordingly, Ms. McLuckey is entitled to summary judgment on the third cause of action for violation of Plaintiffs' First Amendment rights to familial association with respect to John and Gregory's removal and detention and the seventh cause of action for violation of Plaintiffs' Fourteenth Amendment rights to familial association with respect to John and Gregory's detention. In addition, because "[l]iability under Section 1983 arises only upon a showing of personal participation by the defendant," and it is undisputed that Ms. McLuckey did not have any involvement with this case after May 25, 2011 or with the decision to initially place John and Gregory in protective custody, she is also entitled to summary judgment on the first cause of action for violation of John's Fourth Amendment rights to be free of unlawful seizure, the second cause of action for violation of Gregory's Fourth Amendment rights to be free of unlawful seizure, the fifth cause of action for violation of Plaintiffs' Fourteenth Amendment rights to familial association and tenth cause of action for violation of Plaintiffs' Fourteenth Amendment rights for violation of the visitation order.  *Taylor,* 880 F.2d at 1045; *see, e.g., Boyd,* 374 F.3d at 780 ("Integral participation [is required] by each officer as a predicate to liability, but 'integral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation").  Officers are not integral participants simply by virtue of being present at the scene of an alleged unlawful act. *Jones v. Williams*, 297 F.3d 930, 935 (9th Cir. 2002).  Instead, integral participation requires some fundamental involvement in the conduct that allegedly caused the violation.  *See Id.*  Similarly, because none of the other Orange County Social Worker Defendants had any involvement with the Detention Report, the Petition, or the continued detention of John and Gregory, they are entitled to summary judgment on all of Plaintiffs' claims alleged against them to the extent those claims are based on the Detention Report, the Petition, and the continued detention of John and Gregory.

### F.    Ms. Luchonok Is Entitled to Summary Judgment on the Claims Alleged Against Her.

Plaintiffs challenge Ms. Luchonok and other Orange County Social Worker Defendants' actions in continuing to detain John and Gregory and in placing John and Gregory with Barbara. Specifically, Plaintiffs allege that John and Gregory's continued detention violated their First and Fourteenth Amendment rights to familial association and their Fourteenth Amendment rights with respect to John and Gregory's placement with Barbara.[13]

In this case, Ms. Luchonok, who was the primary social worker assigned to this case, prepared the JDR filed on June 14, 2011, as well as Addendum No. 1 and Addendum No. 2.  In order to prepare the JDR, Ms. Luchonok conducted an investigation, including interviewing Gabrielle, Mr. Gross, Barbara, various members of the Hoag Hospital staff and the College Hospital staff, and Veronica Hebert, John and Gregory's maternal aunt.  Ms. Luchonok also reviewed the psychiatric admission note on Gabrielle prepared by Dr. John Chaffee at College

---

[13]  The claims alleged against Ms. Luchonok and the other Orange County Social Worker Defendants with respect to alleged violation of the visitation orders, breast milk orders, and transfer order are addressed separately.

Initials of Deputy Clerk _sr_

Hospital as well as the Petition and Detention Report in this case.  Based on her investigation, Ms. Luchonok recommended in the JDR that the allegations of the Petition be sustained, and, given that Gabrielle and Mr. Gross resided in West Hollywood, that the case be transferred to Los Angeles.  Although Plaintiffs may not agree with Ms. Luchonok's recommendation that the allegations of the Petition should be sustain, there is no indication that she made that recommendation without first conducting a thorough and complete investigation.

In Addendum No. 2, Ms. Luchonok advised the Juvenile Court that John was being placed with his maternal grandmother, Barbara, on the morning of June 16, 2011.  Although Plaintiffs disagree with children's placement with Barbara, it is clear that Ms. Luchonok notified the Juvenile Court that the children would be placed with her, and the Juvenile Court ordered the placement, by authorizing the release of the children to any suitable adult at the discretion of Social Services, finding that Barbara qualified as such a "suitable adult," and overruling the objection of Gabrielle and Mr. Gross to the children's placement with Barbara and confirming the placement order at the June 16, 2011 hearing.  Therefore, the Court concludes based on the evidence viewed in the light most favorable to Plaintiffs that Plaintiffs have failed to demonstrate conduct on the part of Ms. Luchonok or the other Orange County Social Worker Defendants that "shocks the conscience" or establishes a claim for deliberate indifference as a matter of law.  Accordingly, Plaintiffs' claims fail because there was no violation of Plaintiffs' First and Fourteenth Amendment rights to familial association in continuing to detain John and Gregory and in placing John and Gregory with Barbara.

Ms. Luchonok and the Orange County Social Worker Defendants also argue that they are entitled to absolute immunity.  Plaintiffs acknowledge the absolute immunity doctrine, but argue that Ms. Luchonok is not entitled to absolute immunity because her JDR contains numerous false statements.  As explained above, the law is clear that although social workers enjoy absolute immunity, "they are not entitled to absolute immunity from claims that they fabricated evidence during an investigation or made false statements in a dependency petition affidavit that they signed under penalty of perjury, because such actions aren't similar to discretionary decisions about whether to prosecute."  *Beltran*, 514 F.3d at 908.

However, the Court agrees with the Orange County Social Worker Defendants and concludes that Ms. McLuckey is entitled to absolute immunity with respect to her JDR because Plaintiffs have failed to demonstrate the existence of material false statements.  *Constanich*, 627 F.3d at 1115.  Again, Plaintiffs have failed to provide any citation to the materially false statements.  However, in evaluating Plaintiffs' claim that Ms. Luchonok's JDR contained false statements, the Court finds that, similar to the allegations made against Ms. McLuckey, Plaintiffs have failed to demonstrate that Ms. Luchonok included any statements that were false in her JDR.  In addition, even assuming Plaintiffs could meet their burden of demonstrating the existence of false statements, Plaintiffs have not even attempted to argue, nor could they, that any of the alleged misstatements were material to the Juvenile Court's determinations in this case.  Moreover, for the same reasons that the Court discussed with respect to Ms. McLuckey, any false statements contained in the JDR were totally irrelevant to the Court's final detention order issued on June 16, 2011 in light of Plaintiffs' nolo contendre pleas and the extensive colloquy that occurred between the Court and Plaintiffs prior to the Court accepting those nolo contendre pleas.  As a result, the Court had sufficient basis to enter the detention orders based solely on Plaintiffs' nolo contendre pleas, and it was unnecessary for the Court to rely on the information in the reports, and, thus, any

Initials of Deputy Clerk _sr_

false statements that may have been included in the reports would have been totally irrelevant to the Court's ultimate decision to detain John and Gregory.

Given the undisputed facts, no reasonable juror could conclude that the challenged statements were intentionally false when Ms. Luchonok made them or that they were material to the Juvenile Court proceedings in light of Gabrielle and Mr. Gross' nolo contendre pleas. Accordingly, Plaintiffs' claims fail because there was no constitutional violation.

In addition, the Court concludes that Ms. Luchonok and the other Orange County Social Worker Defendants are entitled to absolute immunity in following the Juvenile Court's order to place the children with Barbara. *Tamas v. Department of Social & Health Services*, 630 F.3d 833 (9th Cir. 2010). As explained above, the order of the Court with respect to placement allowed the children to be placed with any suitable adult, including Barbara, and Ms. Luchonok and the other Orange County Social Worker Defendants' actions in executing this order were within the performance of their duties as authorized by statute. June 16, 2011 Reporter's Transcript, 77:24-78:6. Although absolute immunity can be lost if their actions were "clearly and completely outside the scope" of the Orange County Social Worker Defendants' jurisdiction (*Beltran*, 514 F.3d at 506), there is no evidence that their actions in placing the children with Barbara was outside that scope.

Because the Court concludes that there was no constitutional violation caused by the continued detention of John and Gregory or by their placement with Barbara, it need not reach the second step of the *Saucier* analysis. *See, e.g., Johnson*, 340 F.3d at 793-94. However, even if the Court had concluded that Ms. Luchonok and the other Orange County Social Worker Defendants' conduct constituted a constitutional violation, Plaintiffs have not met their burden of showing that Ms. Luchonok and the other Orange County Social Worker Defendants violated a clearly established constitutional right in the situation presented.[14] Likewise, in light of the fact that the Juvenile Court ordered the placement of John and Gregory with any suitable adult, including Barbara, the Court concludes that the existing case law would not have placed a reasonable social worker on notice that following the Court's order would be unlawful.

Accordingly, Ms. Luchonok and the other Orange County Social Worker Defendants are entitled to summary judgment on the third cause of action for violation of Plaintiffs' First Amendment rights to familial association with respect to John and Gregory's removal and detention, the fifth cause of action for violation of Plaintiffs' Fourteenth Amendment rights to familial association as to John and Gregory's placement with Barbara, and the seventh cause of action for violation of Plaintiffs' Fourteenth Amendment rights to familial association with respect to John and Gregory's continued detention.

**G.    The Other Orange County Social Worker Defendants Are Entitled to Summary Judgment on the Claims Alleged Against Them With Respect to the Breast Milk Order, the Visitation Order, and the Transfer Order.**

---

[14]   The Court also concludes Plaintiffs' claim for continued detention fails because the Juvenile Court ordered the children detained and placed in the custody of OCSSA, and Ms. Luchonok and the other Orange County Social Worker Defendants had no authority or ability to unilaterally place the children during the continued dependency proceedings.

Initials of Deputy Clerk _sr_

The balance of Plaintiffs' Fourteenth Amendment familial association claims alleged in the tenth, twelfth, and fourteenth causes of action, arise out of incidents involving alleged violations by the Orange County Social Worker Defendants of the visitation orders entered on May 25 and 27, 2011, the breast milk orders entered on May 27, 2011 and June 15, 2011, and the Transfer Order entered on June 16, 2011 by the Juvenile Court.  The Court has reviewed the evidence submitted by Plaintiffs in support of these claims, and, based on the undisputed facts, the Court concludes that Plaintiffs have failed to establish a constitutional violation as to each of these claims against the Orange County Social Worker Defendants named in those claims, and that the Orange County Social Worker Defendants are entitled to qualified immunity to the extent a constitutional violation has been established.[15]

### 1.     Visitation Orders

As to the visitation orders, Plaintiffs claim in conclusory fashion in their declarations that on several dates they were not allowed their court ordered visitation with their minor children. However, Plaintiffs ignore the fact that the Juvenile Court in making those visitation orders gave the Orange County Social Worker Defendants discretion to modify the visitation orders for the protection of the children.  May 27, 2011 Reporter's Transcript, 37:13-16.  Given that the Orange County Social Worker Defendants had the discretion to modify the visitation orders for the protection of the children, Plaintiffs have failed to demonstrate that the Orange County Social Worker Defendants acted with deliberate indifference in exercising that discretion in denying Plaintiffs visitation with their children.  In fact, the evidence is to the contrary, and it appears that the Orange County Social Worker Defendants took every possible action to make sure Plaintiffs were able to visit their children.  For example, in her deposition, Ms. Luchonok testified that when she was first assigned to the case, there was an issue with Hoag Hospital's policy which was preventing Mr. Gross from visiting Gregory at the hospital.  As soon as she was advised of this issue, Ms. Luchonok immediately contacted the Hoag Hospital social worker, and made sure that Hoag Hospital gave Mr. Gross his court ordered visitation.  In addition, Ms. Luchonok faxed a copy of the visitation order to Orangewood to make sure that Mr. Gross was receiving his court ordered daily visits with John.  Moreover, after John was placed with his grandmother, Barbara, Ms. Luchonok made sure Mr. Gross, and later Gabrielle, received their court ordered visitation through social services.  Depo. of Luchonok, 51:22-25 and 52:1-6.

The Court concludes based on the evidence viewed in the light most favorable to Plaintiffs

---

[15]  Although the Court recognizes that Plaintiffs have raised issues relating to the failure of the Orange County Social Worker Defendants to follow the policy and procedures of OCSSA, Child and Family Services, at various times during the dependency case, that conduct does not rise to the level of a constitutional violation.  In viewing the conduct of the Orange County Social Worker Defendants in the light most favorable to Plaintiffs, such conduct at best sounds in negligence, which does not support the due process claims and other constitutional claims alleged by Plaintiffs. *Daniels v. Williams*, 474 U.S. 327, 328-31 (1986) ("[T]he Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property"); *Davidson v. Cannon*, 474 U.S. 344 (1986) ("[T]he protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care").  Plaintiffs will have ample opportunity to pursue their state law claims in Los Angeles Superior Court.

Initials of Deputy Clerk __sr__

that Plaintiffs have failed to demonstrate conduct on the part of the Orange County Social Worker Defendants that "shocks the conscience" or that establishes a claim for deliberate indifference as a matter of law.  Accordingly, the Orange County Social Worker Defendants are entitled to summary judgment on the visitation order claims because there is no constitutional violation.

In addition, the Court concludes that the Orange County Social Worker Defendants are entitled to absolute immunity in following the Court's visitation orders.  *Tamas*, 630 F.3d at 833. The visitation orders permitted the Orange County Social Worker Defendants to modify the visitation by Gabrielle and Mr. Gross, and their actions in executing those orders was well within the performance of their duties as authorized by statute.  Although absolute immunity can be lost if their actions were "clearly and completely outside the scope" of the Orange County Social Worker Defendants' jurisdiction (*Beltran*, 514 F.3d at 506), there is no evidence that their actions in executing the visitation orders was outside that scope.

Because the Court concludes that there was no constitutional violation, it need not reach the second step of the *Saucier* analysis.  *See, e.g., Johnson*, 340 F.3d at 793-94.  However, even if the Court had concluded that the Orange County Social Worker Defendants' conduct constituted a constitutional violation, Plaintiffs have not met their burden of showing that it would have been clear to a reasonable social worker that modifying the visitation schedule as allowed by the visitation orders was unlawful in the situation presented.  Therefore, the Orange County Social Worker Defendants would still be entitled to summary judgment on the grounds of qualified immunity.

### 2.    Breast Milk Order

As to the breast milk orders, Ms. Luchonok testified that when the Court initially ordered that Gabrielle would be allowed to breast feed if it was medically approved, she contacted Gabrielle's medical care providers at College Hospital to seek medical approval.  Ms. Luchonok was advised by the charge nurse that Dr. Chaffee indicated it would not be appropriate to breast feed because of Gabrielle's medication.  After Gabrielle was discharged from College Hospital, Ms. Luchonok reviewed a report from Dr. Dang, who was then treating Gabrielle and who recommended that Gabrielle should be allowed to breast feed.  At the June 15, 2011 hearing, the Court indicated that Gabrielle could breast feed, but that the milk had to be tested and approved by the child's pediatrician.  Following the hearing, Ms. Luchonok contacted Hoag Hospital and advised them that the Court ordered Gregory's doctor to approve breast feeding, and faxed a copy of the order to Hoag Hospital.  After Hoag Hospital advised Ms. Luchonok that it did not have facilities to test the breast milk at the hospital, she attempted to contact Gabrielle's counsel to advise her that there was a new issue involving the testing of the breast milk.

However, once Gregory was released from Hoag Hospital on June 20, 2011, Gregory was no longer under the care of the pediatrician at Hoag Hospital, and, thus, had to be examined by a new pediatrician.  As a result, in order to comply with the breast milk orders, Ms. Luchonok arranged an appointment for Gregory with a pediatrician, Dr. Iman Bara.  Unfortunately, Dr. Bara refused to become involved, and Ms. Luchonok scheduled an appointment with a different pediatrician, Dr. Taeed, who ultimately gave the approval for Gabrielle to breast feed Gregory. Thereafter, the Court deleted the testing requirement, and Gabrielle was able to give stored breast

Initials of Deputy Clerk __sr__

milk to Gregory.[16]  Ms. Luchonok directed Barbara, who was caring for John and Gregory, to provide Gabrielle's breast milk to Gregory after Ms. Luchonok received the approval from Dr. Taeed.  Depo. of Luchonok, 133-137.  Ms. Luchonok testified that the parents brought the breast milk in a cooler to visitations with the children, and Barbara took the breast milk home, to give to Gregory.  However, unbeknownst to Ms. Luchonok and not discovered until after this action was filed, Barbara was not, in fact, giving the breast milk to Gregory, despite being directed to do so by Ms. Luchonok.

Although Plaintiffs argue that Ms. Luchonok and the other named Orange County Social Worker Defendants were somehow responsible for Barbara's decision not to provide the breast milk to Gregory, there is simply no evidence to support such a theory.  Ms. Luchonok delivered the breast milk to Barbara and picked up the empty containers, reasonably indicating that the breast milk had been given to Gregory.  There was no indication that any of the named Orange County Social Worker Defendants knew or should have known Barbara was not complying with the breast milk order and it only became known as a result of her deposition in this action.

The Court concludes based on the evidence viewed in the light most favorable to Plaintiffs that Plaintiffs have failed to demonstrate conduct on the part of the named Orange County Social Worker Defendants that "shocks the conscience" or that establishes a claim for deliberate indifference as a matter of law.  Accordingly, the named Orange County Social Worker Defendants are entitled to summary judgment on the breast milk order claims because there is no constitutional violation.

In addition, the Court concludes that the named Orange County Social Worker Defendants are entitled to absolute immunity in following the Court's breast milk orders.  *Tamas*, 630 F.3d at 833.  The breast milk orders did not require the named Orange County Social Worker Defendants to either feed the breast milk to Gregory or supervise Barbara while she did so, and their actions in executing those orders was well within the performance of their duties as authorized by statute.  Although absolute immunity can be lost if their actions were "clearly and completely outside the scope" of the Orange County Social Worker Defendants' jurisdiction (*Beltran*, 514 F.3d at 506), there is no evidence that their actions in executing the breast milk orders was outside that scope.

Because the Court concludes that there was no constitutional violation, it need not reach the second step of the *Saucier* analysis.  *See, e.g., Johnson*, 340 F.3d at 793-94.  However, even if the Court had concluded that the named Orange County Social Worker Defendants' conduct constituted a constitutional violation, Plaintiffs have not met their burden of showing that it would have been clear to a reasonable social worker that executing the breast milk orders as required by the Juvenile Court was unlawful in the situation presented.  Therefore, the Orange County Social Worker Defendants would still be entitled to summary judgment on the grounds of qualified immunity.

### 3.    Transfer Order

---

[16]  Even though Gabrielle had been breast feeding John prior to John's removal from her custody, Dr. Taeed advised that it was not necessary to provide breast milk to John.

Finally, with respect to the Transfer Order, it is undisputed that when Ms. Luchonok finally reviewed a copy of the June 16, 2011 Transfer Order, she immediately recognized that it was not the same JV 550 that she had prepared and submitted to the Juvenile Court in anticipation of the June 16, 2011 hearing (which allowed for John and Gregory to remain in Barbara's custody), and that the JV 550 signed by Referee Evans was incorrect (because it required John to be removed from Barbara's custody and placed in congregate care in Los Angeles County).  As a result of this error, Ms. Luchonok immediately contacted Ms. Arteaga, the Court Officer in Referee Evans' Court, and advised Ms. Arteaga that the Transfer Order was erroneous.

After Ms. Arteaga acknowledged that it was a mistake, Ms. Luchonok contacted the City Attorney's office to discussed the error with Mr. Dunn.  Based on Mr. Dunn's legal advice, Ms. Luchonok decided not to transfer John to congregate care in Los Angeles, which all parties agreed would have been detrimental to John.  Ms. Luchonok was not present at the hearing before Commissioner Shade on June 27, 2011 when Mr. Dunn raised the issue of amending the Transfer Order.  Therefore, even accepting Plaintiffs' argument that Mr. Dunn may have made misrepresentations to the Juvenile Court regarding the transfer of John, those statements cannot be attributed to Ms. Luchonok or any of the Orange County Social Worker Defendants.  Moreover, to the extent such statements might be actionable, they would not give rise to a constitutional violation.  Although the email dated June 27, 2011 to Ms. Luchonok from Mr. Dunn indicates that the Juvenile Court declined to modify the transfer order, Mr. Dunn continued to advise Ms. Luchonok not to transfer John to congregate care in Los Angeles County.  In reliance on that advice, a decision was made that it would not be in the best interest of John to be transferred to congregate care in Los Angeles.  In light of all of the evidence relating to the Transfer Order, the Court cannot conclude that the decision to allow John to remain with his maternal grandmother as approved by the Juvenile Court instead of transferring him to congregate care "shocks the conscience."  The exact degree of wrongfulness necessary to reach the conscience shocking level depends upon the circumstances of a particular case and making a bad decision or acting negligently is not the sort of conscience shocking behavior that violates the constitution.  *Lewis*, 523 U.S. at 833.  In this case, the Court is satisfied that although the decision may be questionable, the high level of wrongfulness has not been met here.  Accordingly, Ms. Luchonok and the other named Orange County Social Worker Defendants did not violate Plaintiffs' Fourteenth Amendment rights to familial association.

## IV.    Conclusion

For all the foregoing reasons, Defendants' Motion is **GRANTED**.  The Orange County Social Worker Defendants are entitled to summary judgement as follows: (1) Ms. Villa, Ms. Westbrook, and Ms. McLuckey on the first cause of action for violation of John's Fourth Amendment rights with respect to his removal and seizure from his parents' custody; (2) Ms. Villa, Ms. Westbrook, and Ms. McLuckey on the second cause of action for violation of Gregory's Fourth Amendment rights with respect to his removal and seizure from his parents' custody; (3) all the Orange County Social Worker Defendants named in the third cause of action for violation of Plaintiffs' First Amendment rights to familial association with respect to John and Gregory's removal and detention; (4) all the Orange County Social Worker Defendants named in the fifth claim of relief for violation of the Plaintiffs' Fourteenth Amendment rights to familial association with respect to John and Gregory's placement with Barbara; (5) all the Orange County Social Worker Defendants named in the seventh cause of action for violation of Plaintiffs' Fourteenth Amendment rights with respect to the initial and

Initials of Deputy Clerk _sr_

continued detention of John and Gregory; (6) all the Orange County Social Worker Defendants named in the tenth cause of action for violation of Plaintiffs' Fourteenth Amendment rights regarding failure to obey the visitation orders; (7) Ms. Luchonok, Ms. Parrish-Rehoreg, and Ms. Zuniga on the twelfth cause of action for violation of Plaintiffs' Fourteenth Amendment rights regarding failure to obey the transfer order; and (8) Ms. Luchonok and Ms. Zuniga on the fourteenth cause of action for violation of Plaintiffs' Fourteenth Amendment rights regarding failure to obey the breast milk order.

In light of the fact that the Court has dismissed the only claims over which this Court has original jurisdiction, and after considering judicial economy, convenience, fairness, and comity, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.  *See* 28 U.S.C. § 1367(c)(3); *See Satey v. JPMorgan Chase & Co.*, 521 F.3d 1087, 1091 (9th Cir. 2008) (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 351 (1988)) ("'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state law claims.'")  Accordingly, this action is hereby **REMANDED** to Los Angeles Superior Court.

The parties are ordered to meet and confer and prepare a joint proposed Judgment which is consistent with the Court's Order.  The parties shall lodge the joint proposed Judgment with the Court on or before October 15, 2013.  In the unlikely event that counsel are unable to agree upon a joint proposed Judgment, the parties shall each submit separate versions of a proposed Judgment along with a declaration outlining their objections to the opposing party's version no later than October 15, 2013.

IT IS SO ORDERED.

Initials of Deputy Clerk   sr